

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TRAX, LLC and                          )
TRAX INTERNATIONAL CORP.,              )
                                       )
          Plaintiffs,                  )
                                       )
     v.                                )    Case No. 10-CV-6901
                                       )
CONTINENTAL CASUALTY                   )    Judge John W. Darrah
COMPANY,                               )
                                       )
          Defendant.                   )

## AMENDED MEMORANDUM OPINION AND ORDER

On October 26, 2010, Plaintiffs, TRAX, LLC and TRAX INTERNATIONAL

CORP. (collectively, "TRAX"), sued Defendant, Continental Casualty Company

("Continental"), alleging Continental breached its duty under an insurance policy to settle

an underlying lawsuit: *nHance Technologies, Inc. v. TRAX, LLC, et al.*, No. 6:09-cv-

00018, United States District Court for the Western District of Virginia ("*nHance*

Action"). TRAX sought damages for Continental's purported failure to settle the *nHance*

Action despite its duties under an insurance policy it issued. TRAX filed their Amended

Complaint on June 27, 2011.

Both parties moved for summary judgment, and on December 14, 2011, partial

summary judgment was awarded to Continental, holding that Virginia law was applicable

to the substantive issues in this dispute and that, therefore, Continental may not

necessarily be required to pay the settlement costs relating to the *nHance* Action in its

entirety but, rather, only the allocated portion of the claims deemed to be covered by the

insurance policy. Following this ruling, a bench trial commenced on January 23, 2012, and concluded on January 25, 2012.

The bench trial included the testimony of several witnesses and the admission of various exhibits into evidence. The parties also submitted written closing arguments, written responses to those arguments, and proposed findings of fact[1] and conclusions of law.

The Court has considered the evidence, including the testimony of the witnesses and exhibits, and has further considered the written submissions of counsel for the parties and the authority cited therein. The Court weighed the testimony of each witness and determined whether the testimony was truthful and accurate (in part, in whole, or not at all) and decided what weight, if any, to give to the testimony of each witness. In making this determination, the Court considered, among other things: the ability and opportunity of the witness to see, hear, or know information about which the witness testified; the witness's memory; any interest, bias, or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all of the evidence in the case. *See* Fed. Civ. Jury Instr. 7th Cir. § 1.13 (2009).

Pursuant to Fed. R. Civ. P. 52, the Court enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all the admissible evidence and this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law,

---

[1] To the extent a proposed finding of fact relied on information not in evidence at trial, it was disregarded.

they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that
Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed
Findings of Fact. The Decision section of this Opinion and Order, for purposes of
organization and clarity, contains some reference to law and facts. To the extent, if any,
that any part of the Decision may be considered Findings of Fact or Conclusions of Law,
it shall be so deemed.

## FINDINGS OF FACT

*The Parties and the Insurance Policy*

TRAX, LLC is a Virginia limited liability company; its member, TRAX
INTERNATIONAL CORP., is a New Mexico corporation with its executive office
located in Nevada. TRAX provides testing services for the U.S. Government and
develops and maintains software simulation systems for U.S. power plants. Continental
is an Illinois insurance company.

Continental sold TRAX, LLC a Global Technology Errors & Omissions Policy
("the Policy"), with a term of March 1, 2009 through March 1, 2010. TRAX, LLC is the
named insured party under the Policy; but, TRAX INTERNATIONAL CORP., by virtue
of its being a member of TRAX, LLC, is also insured under the policy. The Policy had a
general and claim limit of $5 million and a $25,000.00 deductible. The Policy provided
coverage in the event TRAX became legally obligated to pay damages and defense costs
as the result of a claim covered under the Policy. A claim, under the Policy, was defined
as "a demand, including the service of suit or the institution of arbitration or mediation
proceedings, received by an Insured for money or services and alleging a 'wrongful act.'"

3

(Trial Ex. 1.) The Policy provided that a "wrongful act" meant "any actual or alleged

breach of duty, neglect, error or omission . . . committed solely in the conduct of

'technology services' and 'telecommunication services' for others for a fee. . . ." (*Id.*)

Damages under the Policy included settlements, judgments and interest but excluded "the

return or restitution of fees, expenses or costs for . . . 'technology services' . . . performed

or to be performed by the insured" and "matters which are uninsurable under the law

pursuant to which this Coverage Form shall be construed." (*Id.*) Claims of trade secret

misappropriation, among other distinct groups of claims, were excluded from the Policy's

coverage.

### The nHance Action

The *nHance* Action commenced on March 10, 2009, when nHance Technologies,

Inc. ("nHance") sued TRAX, alleging copyright infringement. On April 22, 2010,

nHance amended its complaint, further alleging a claim for misappropriation of trade

secrets and adding TRX Corporation f/k/a TRAX Corporation and Ronald R. Dixon as

defendants. These additional defendants were not insured under the Policy. nHance

alleged the defendants in the *nHance* Action sold and distributed power plant simulation

software, called "Pro-TRAX," which used source code copied from nHance's own

software product, "MMS." The use of nHance's code, nHance alleged, amounted to

copyright infringement and the misappropriation of trade secrets; nHance argued it was

entitled to recover any and all profits those defendants gained by the alleged copyright

infringement or misappropriation of trade secrets, as well as injunctive relief.

The Electric Power Research Institute developed power plant simulation software and licensed this software to Babcock & Wilcox ("B&W") in 1984. Ronald Dixon, a defendant in the *nHance* Action, was employed by B&W from 1984 to 1987 as a computer programmer. A company, Framatone, purchased this software, MMS, from B&W in 2001, and nHance subsequently purchased certain rights in the MMS software in 2005.

nHance alleged when Dixon left his position at B&W, he took a copy of the MMS source code with him. Thereafter, nHance claimed, Dixon formed his own company, co-defendant TRX Corp., which used the power plant simulation software program "PC-TRAX." TRAX, relying on Dixon's representations that he created the PC-TRAX software and had full rights to it, spent $6 million in 2004 to purchase assets from Dixon's company and began marketing the software as "Pro-TRAX." According to nHance, experts compared the source code of the MMS software used by B&W and the PC-TRAX software purchased by TRAX from Dixon and TRX Corp. This comparison established that portions of Dixon's PC-TRAX code were identical to the MMS code, including numerous typographical errors.

If nHance could prove copyright ownership of the allegedly copied code at trial, TRAX would be liable for copyright infringement and for damages measured by TRAX's profits from its use of the infringing code. TRAX never had a contractual relationship with the other code predecessors, including nHance, Framatone, B&W, and the Electric Power Research Institute; therefore, there was no evidence to prove that TRAX misappropriated trade secrets. Rather, the misappropriated trade secret alleged by

5

nHance was the same software code that was the basis of the copyright infringement claim.

### Continental's Involvement with the nHance Action

On November 6, 2009, after the first *nHance* complaint was filed, but before nHance's first amended complaint, TRAX notified Continental of the *nHance* Action and requested coverage and a defense. Continental assigned one of its claims consultants, Gabriela Wainschtok, to handle TRAX's claim.

Continental contacted TRAX by letter on November 19, 2009, and acknowledged that one or more of the claims pled in the *nHance* Action qualified as a claim under the Policy. Continental advised TRAX to place all other insurance carriers on notice of this claim and also reminded TRAX that, under the Policy, claims of trade secret misappropriation were excluded from coverage. Continental consented to the continued representation of TRAX by the law firm of Ray, Quinney and Nebeker; the other *nHance* defendants, Ronald Dixon and TRX Corp., were represented by different defense counsel.

The following day, November 20, 2009, TRAX received a letter from Continental, explaining that Continental would not pay the fees or expenses related to the defense of the matter prior to TRAX's submission of the claim on November 6, 2009.

### The Settlement Conference and Related Communications

The court in the Western District of Virginia ordered a settlement conference for the *nHance* Action, and it was conducted on August 24, 2010. Prior to the conference, TRAX and Continental communicated about the parties' positions, the likelihood that

6

TRAX would be found liable, and the potential damages. Continental continued to reserve its rights to deny coverage in the future. Before the conference, nHance indicated that a damages expert valued TRAX's damages in excess of $8 million.

On August 17, 2010, Continental informed TRAX of its new position: that nHance was seeking damages, amounting to restitution or a disgorgement of profits, which Continental believed was excluded from coverage under the Policy. Continental further reiterated that the Policy did not cover claims of misappropriation of trade secrets. TRAX responded by arguing Continental was mischaracterizing the damages at issue in the *nHance* Action.

All parties and their counsel in the *nHance* Action, as well as Wainschtok, on behalf of Continental, attended the settlement conference on August 24, 2010. At the settlement conference, it was made clear that settlement of the *nHance* Action was appropriate, particularly considering the likelihood of liability and the potential for high damages awarded by a jury in excess of the policy limit of $5 million. The focus of the settlement discussion was on the copyright infringement claim; very little discussion was had with regards to the trade secret claim. nHance reduced its settlement demand, seeking $4 million from TRAX. TRAX requested that Continental settle the suit, but Continental offered to contribute only $350,000.00 toward the settlement. TRAX's defense counsel advised TRAX that a $2 million settlement offer would be reasonable. Wainschtok, through her supervisors, had the authority to settle up to $2 million.

Because of the likelihood of an adverse judgment, Continental agreed it would be prudent of TRAX to settle the *nHance* Action for up to $1.95 million but continued to insist Continental would only contribute $350,000.00 to the settlement.

In spite of Continental's extremely limited contribution offer, TRAX determined, with counsel and the Magistrate Judge, that the most prudent course would be to settle the *nHance* Action for $1.95 million with its own money, in exchange for full, mutual releases of all present and future claims. Having determined neither Defendant TRX Corp. nor Ronald Dixon possessed any assets to pay a settlement, nHance released those parties in the settlement agreement. The settlement agreement further included a license for the software for no additional consideration, though this was never previously discussed or negotiated during the settlement discussion. Continental was not involved in any way in the drafting of the settlement agreement; Continental's representative, Wainschtok, left the settlement conference while the settlement was being negotiated. Continental did not contribute any amount to the nHance settlement payment and did not set aside a reserve for potential damages relating to the *nHance* Action.

## CONCLUSIONS OF LAW

### *Jurisdiction and Venue*

The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, which establishes jurisdiction in cases of diversity. TRAX and Continental are citizens of different states, and the amount in controversy exceeds $75,000.00; therefore, the diversity requirements are met. Venue is proper in the Northern District of Illinois, pursuant to 28 U.S.C. § 1391, as Continental, the defendant, resides in this District.

*Applicable Virginia Law*

As previously determined by the Court, Virginia law governs the interpretation and construction of the Policy and its application to the issues. Under Virginia law, allocation is permitted when a policy dispute involves both claims and parties covered and uncovered by the policy. *See RML Corp. v. Assurance Co. of Am.*, 60 Va. Cir. 269 (Va. Cir. Ct. 2002). The plaintiff has the burden of proving the allocation at trial. *Id.* Provided that a policy covers damages incurred by a settlement, "the obligation assumed by the insurer with respect to settlement is to exercise good faith in dealing with offers of compromise, having both its own and the insured's interests in mind. And it may be said also that a reasonably diligent effort must be made to ascertain the facts upon which a good faith judgment as to settlement can be formulated." *Aetna Cas. & Sur. Co. v. Price*, 206 Va. 749, 761-62 (1966) (internal quotations omitted) (*Price*). Then, the defendant must prove its affirmative defenses, showing why policy exclusions were applicable. *Id.*

An insurance policy, like other contracts, is construed as it was written, in accordance with its plain meaning, provided the terms are clear and unambiguous. *PMA Capital Ins. Co. v. US Airways, Inc.*, 271 Va. 352, 358 (2006). In Virginia, ambiguities in insurance policies are to be liberally construed in favor of the insured, particularly since the policies are drafted by the insurance companies. *United Services Auto. Ass'n v. Webb*, 235 Va. 655, 657 (1988). If the claims alleged against the insured may be covered by a general liability insurance policy, the insurer has a duty to defend, and it may be liable also to pay any judgment rendered upon those allegations. However, if it is clear the insurer "would not be liable under its contract for any judgment based upon the

9

allegations, it has no duty even to defend." *Town Crier, Inc. v. Hume*, 721 F.Supp. 99, 102 (E.D. Va. 1989).

Awarding prejudgment interest is a substantive issue, and therefore, Virginia law governs in this dispute. *Perlman v. Zell*, 185 F.3d 850, 857 (7th Cir. 1999). In Virginia, prejudgment interest is at a rate of six percent. Va. Code Ann. § 6.2-302. Awarding prejudgment interest is at the court's discretion. *Virginia Elec. and Power Co. v. Norfolk Southern Ry. Co.*, 278 Va. 444, 471 (2009).

## DECISION

*Breach of Duty and Coverage of the Return of Profits*

Continental provided TRAX with an insurance policy, stating Continental would pay "sums that [TRAX] becomes legally obligated to pay as "damages" because of a covered "claim" that is both first made against [TRAX] and reported in writing to [Continental] during the policy period by reason of a "wrongful act" by [TRAX] . . . ." (Ex. 1 at 1.) The policy went on to define a claim as "a demand, including the service of suit . . . received by [TRAX] for money and services and alleging a "wrongful act." (Ex. 1 at 8.) A "wrongful act" is defined as "any actual or alleged breach of duty, neglect, error or omission (1) committed solely in the conduct of 'technology services,'" meaning, in part, "designing, developing, programming, installing, servicing, supporting, maintaining and repairing computer software, computer code and computer firmware." (Ex. 1 at 9-10.) Damages, under the Policy, included settlements. (Ex. 1 at 8.)

Upon learning of the *nHance* Action, Continental reviewed the claim submitted by TRAX regarding the action and wrote to TRAX, indicating that "[i]t appears that this

10

matter qualifies as a claim in that [TRAX] allegedly committed a wrongful act in the performance of technology services. . . . As such, the duty to defend has been triggered." (Ex. 4 at 2.) Continental's November 19, 2009 letter also noted that the Policy excluded coverage of trade secret misappropriation claims and reserved Continental's rights to deny coverage in the future. (*Id.*)

It is clear from the terms of the Policy that a suit alleging copyright infringement qualified as a claim, as the *nHance* Action contemplated a suit for "an alleged breach of duty, neglect, or error" committed in the design, development, or programming of computer software or code: here, the Pro-TRAX system appeared to directly infringe on nHance's MMS system. Continental had a duty to defend TRAX in the *nHance* Action. *Price*, 206 Va. at 765. Moreover, Continental acknowledged that the settlement in the *nHance* Action was reasonable and prudent. (Trial Tr. 439:7 – 440:11, Jan. 25, 2012.)

However, after first asserting the Policy provided coverage over the *nHance* Action, Continental backpedaled, instead alleging that because, in Continental's view, nHance was seeking restitution, or "the return of ill-gotten gain," the damages sought by nHance were not insured under the Policy. (Ex. 8.) "Return of profits" is not an item excluded from the Policy's definition of damages.[2] Instead, Continental relied on the provision of the Policy that indicated that damages excluded "matters which are uninsurable under the law pursuant to which this Coverage Form shall be construed." (Ex. 1 at 8.) Continental further assumed that "no state's law" would permit the insuring

---

[2] "[T]he return or restitution of fees, expenses, or costs for 'technology products'" or services *was* excluded from the definition of damages under the Policy. However, Continental did not rely on this provision in asserting its argument that the return of *profits* was against public policy. (Ex. 1 at 8; Trial Tr. 417:1 – 418:2, Jan. 24, 2012.)

of a return of profits. However, Continental submits no legal authority to support its contention that Virginia law precludes the *nHance* Action settlement from being insurable.

TRAX obtained its general liability policy from Continental to provide TRAX protection from the risk that it would be liable for a breach of duty, error, or omission in the conduct of its technology services business. When nHance sued TRAX for copyright infringement, this was precisely the sort of liability TRAX sought to protect against with Continental's Policy. Moreover, nHance was not seeking some novel and uninsurable type of damages from TRAX: the Copyright Act provides where infringement is found, "[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and *any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.*" 17 U.S.C. § 504(b) (emphasis added). Notably, none of the legal authority Continental cites in support of its uninsurable restitution argument involves a copyright infringement action. nHance did not seek a restitution or disgorgement but, rather, the infringer's profits it was permitted to recover under the Copyright Act. Therefore, the profits nHance sought from TRAX were not uninsurable, and Continental breached its duty to defend TRAX when it failed to cover the *nHance* Action settlement.

*No Basis for Allocation*

Allocation for Misappropriation of Trade Secrets

Beyond its position that it did not breach its duty to defend TRAX under the Policy, Continental argues it is not responsible for portions of the *nHance* Action

settlement. Specifically, Continental asserts that a portion of the *nHance* settlement is attributable to the trade secret claim, which was not covered under the Policy.

In support of this position, Continental relies on the testimony of its expert, Robert Taylor, who opined that the amount of the settlement should be split equally between the copyright claim and the trade secret claim. TRAX moved to exclude Taylor's testimony, arguing his testimony was irrelevant and that Taylor had inadequate experience and training to offer an expert opinion as to the allocation of a settlement in a copyright case. TRAX's motion is granted, as Taylor's testimony was irrelevant and appeared to not be based on sufficient information; he never spoke to any participant at the *nHance* Settlement Conference nor read the participants' depositions prior to preparing his written opinion. Therefore, TRAX's motion to exclude Taylor's testimony is granted, as his testimony failed to meet the requirements of Fed. R. Evid. 702. Taylor's testimony was excluded from the analysis of this Opinion.

However, even if Taylor's testimony was to be considered, the facts showed, at most, only a small part of the settlement discussion concerned the trade secret claim. The trade secret claim was added to nHance's amended complaint in conjunction with nHance's adding Ronald Dixon as a defendant. Dixon was the only party who could have possibly misappropriated the trade secrets relating to the MMS code. It was made clear during the *nHance* settlement discussion that if there was any trade secret misappropriation, it had occurred in 1987, prior to the formation of TRAX. (Trial Tr. 148:8 – 149:16, Jan. 23, 2012.) Therefore, when the *nHance* Action settled, no amount

13

of the settlement was apportioned to the trade secret misappropriation claim. No facts support an allocation of the settlement to nHance's trade secret claim.

Allocation for Claims against Ronald Dixon and TRX Corporation

Continental further argues the amount due to TRAX for its settlement costs with nHance should be reduced, because a portion of the settlement was for the claims attributable to Ronald Dixon and his company, TRX Corporation. Dixon was a former employee of TRAX, terminated by TRAX in 2008. (Trial Tr. 221:4 – 224:4, Jan. 23, 2012.) The same claims were alleged against all the defendants, including Dixon and TRX Corp., in nHance's amended complaint, seeking the same damages. However, at the settlement conference, it became apparent that Dixon had no assets and no ability to contribute to the settlement. (Trial. Tr. 235:25 – 237:10, Jan. 23, 2012.) The only property Dixon was known to possess was apparently completely mortgaged and had no transferable value. (*Id.*) Moreover, TRAX had waived any claims against Dixon it could have pursued when it terminated him. Upon learning Dixon had no assets, the Magistrate Judge conducting the settlement, in conjunction with the parties, seeing the futility in trying to obtain a contribution from Dixon, agreed to proceed with the drafting of the settlement agreement without forcing a contribution from Dixon. While Dixon was named as a party released in the *nHance* settlement agreement, had he not been released, nHance would still have been unable to recover damages from him. Therefore, no amount of TRAX's settlement with nHance is attributable to Dixon or his defunct company, TRX Corp.; no facts support an allocation of the settlement to the claims against Dixon or TRX Corp.

14

## Allocation for Software License

Finally, Continental agues a portion of the *nHance* settlement should be allocated to TRAX's purchasing of a license, which, Continental asserts, is not covered under the Policy. As the evidence at trial demonstrated, however, there was no negotiation of the cost of a license when the parties agreed to a settlement of $1.95 million. Rather, in drafting the final terms of the settlement agreement, counsel for nHance offered to "throw a license in" for no additional consideration. (Trial Tr. 155:16 – 161:3, Jan. 23, 2012.) Because the license came without any warranty as to the original ownership of the code that was being licensed, a license would have had limited value. However, it was not a portion of the settlement that TRAX paid for *in addition to* the settlement of the copyright infringement claim. Rather, it was simply a last-minute decision made by the parties' counsel, without any impact on the amount due from TRAX to nHance. Thus, no allocation of the settlement need be attributed to the issuance of a license.

Therefore, TRAX has met its burden, demonstrating that the entire *nHance* settlement was covered by the Policy. Moreover, Continental has failed to show how any of the policy exclusions it presents would be applicable and exclude coverage of the settlement. *See RML*, 60 Va. Cir. at 269.

### Prejudgment Interest

Because Continental breached its duty to defend TRAX under the policy and, further, that none of the *nHance* settlement should be allocated to other parties or claims outside TRAX's copyright infringement claim, the Court must determine if an award of prejudgment interest is appropriate. Under Virginia law, the awarding of prejudgment

Case: 1:10-cv-06901 Document #: 164 Filed: 08/29/12 Page 16 of 17 PageID #:3316

interest is at the discretion of the court; in Virginia, the rate of prejudgment interest is 6

percent. "Because prejudgment interest seeks to make the plaintiff whole, Virginia law

treats it as part of the actual damages sought to be recovered." *Hardey v. Metzger*, No.

2628–07–4, 2008 WL 3895686, at *9 (Va. App. Aug. 26, 2008) (internal quotations

omitted). "The essential rationale for awarding prejudgment interest is to ensure that an

injured party is fully compensated for its loss." *Id.* (quoting *City of Milwaukee v.

Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995)). In consideration of the facts

demonstrated at trial and the determinations made above, an award of 6 percent

prejudgment interest is appropriate. Therefore, TRAX is awarded $134,631.00, the

amount of $320.55 per day from December 1, 2010 (the date of the *nHance* settlement

payment) through January 25, 2012 (the last date of the trial), plus $320.55 per day

thereafter through the date upon which judgment is entered.[3] Counsel for Continental

conceded at trial that in the event TRAX succeeded, Virginia law permits the award of

prejudgment interest. (Trial Tr. 48:7 – 48:23, Jan. 23, 2012.)

## CONCLUSION

As the Plaintiffs, TRAX have the burden of showing what allocation, if any, is

necessary, between the various claims and parties. TRAX met this burden and

demonstrated that Continental bears the entire burden of the *nHance* settlement. Having

found Continental breached its duty under the Policy terms, judgment is therefore entered

in favor of TRAX, and TRAX is awarded $1.95 million in damages from Continental:

---

[3] TRAX erroneously states that the prejudgment interest should be awarded up through the date of "January 24, 2010," an obvious mistake, as TRAX did not pay the settlement to nHance until December 1, 2010.

16

the value of the *nHance* Action settlement Continental was required to pay under the

Policy. TRAX is further awarded prejudgment interest in the amount of $134,631.00

through January 25, 2012, and an additional $320.55 per day thereafter through the date

upon which judgment is entered against Continental.

Date: 8-29-12

JOHN W. DARRAH
United States District Court Judge

17